## THE BARGE NO. 5.

### SUMMERS FERTILIZER CO. v. CANTON CO.

(District Court, D. Maryland. February 23, 1923.)

1. **Wharves ⊜20(2)—Shipowner held not negligent in failing to discover broken piles.**

Evidence that piles which had been driven into the bed under a slip, and broken off more than 6 feet below the water, had been there so long that no one remembered their existence, and that they were located so close to the bulkhead that they were not discovered by dredging, *held* to show that the owners of the slip were not negligent in failing to discover the presence of the piles and warning a barge thereof.

2. **Wharves ⊜20(7)—Evidence held to show negligence in care of barge was cause of damage to cargo.**

On libel for injury to a cargo, which sank in a slip, and was thereafter found to have been penetrated by two broken-off piles, evidence showing there should have been at least 3 feet of water between the bottom of the barge and the piles, that the owner of the barge had manifested anxiety when she was being loaded, and that she had a list when she was moored in the slip, but that she was nevertheless uncared for for more than 24 hours, *held* to show that the cause of the damage was the unseaworthiness of the barge and negligence in her care, and not the presence of the piles.

In Admiralty. Libel by the Summers Fertilizer Company against Barge No. 5 and the Canton Company. Libel against the Canton Company dismissed, and decree rendered for libelant against the barge.

Frank, Emory, Beeuwkes & Skeen, of Baltimore, Md., for libelant.

Keech, Deming, Kemp & Carman, of Baltimore, Md., for respondent.

William L. All, of Baltimore, Md. (Venable, Baetjer & Howard, of Baltimore, Md., on the brief), for the Canton Co.

ROSE, Circuit Judge. Some 150 tons of fertilizer belonging to the libelant, the Summers Fertilizer Company, was on barge No. 5 when the latter on Sunday, July 23, 1922, sank in a slip belonging to the Canton Company. When the barge was raised, it was found that her bottom had been pierced by the upper ends of two broken-off piles, the lower extremities of which were imbedded many feet deep in the mud and soil underlying the slip. The fertilizer was damaged to the extent of $1,535, and its owner, the libelant, here seeks to recover that amount from one or the other, or both, of the respondents. For brevity the parties will be referred to as the Summers, the Barge, and the Canton, respectively.

The fertilizer had been at Block Street wharf. The Summers wished to put it upon cars for shipment. One of the officials of the Summers had formerly been an officer of the Nitrate Agencies Company, hereinafter called the Agencies. The latter leased from the Canton Pier 1, which formed the western side of the slip in which the accident happened. With the pier was also rented two warehouses and the land adjacent to them. One of them was to the west of the pier; the other to the north of the bulkhead at which the Barge sank. This bulkhead formed the northernmost inclosure of the slip. On the leased land there were railroad connections. At the request of the Summers, the Agen-

cies, partly to be obliging, and partly to furnish work for its own stevedoring gang in a slack time, agreed that the fertilizer should be landed on its property and there put on the cars. Its laborers were to do all the handling and were to be paid for it by the Summers. The Agencies were to get no direct pecuniary profit out of the transaction.

These understandings having been arrived at, the Summers set about having the fertilizer moved from Block street to Pier 1. Wathen & Co. are shipbrokers in Baltimore. Summers called them up, and asked if they had any barges for hire. They said they had, and could furnish them at $10 a day apiece. Those they intended to furnish, and which were in fact used, had never before been regularly employed in the lighterage work of Baltimore harbor, if they had ever been used in it at all. They had been built for use in the Chesapeake and Delaware Canal and were somewhat narrower, appreciably deeper, and not quite so stable as the ordinary harbor lighter. At the time there was little employment for them in the Canal, and at the suggestion of Wathen & Co. their owner brought them to Baltimore in the hope of there finding profitable use for them. Before they were put to their new service, they were sent to Rhode's shipyard for overhauling and caulking. The work upon the one with which we are here concerned was completed only a couple of days or so before it entered upon the engagement which had so unfortunate an ending.

When the Summers took up with Wathen & Co. the hiring of the Barge, it asked whether the insurance on it covered the cargo as well. It understood Wathen & Co. to say that it did. In the port of Baltimore it is not unusual for barge owners to carry insurance for the protection of those who intrust cargo to them, and I have little doubt that the language used by Wathen & Co. justified Summers in supposing that its fertilizer would be fully protected, although all that Wathen & Co. had intended to convey was that the underwriters on the Barge would be answerable for the cargo, if it suffered in consequence of anything for which the Barge would be liable. In view of the conclusion to be hereinafter stated, as to the actual cause of the accident, it is unnecessary to inquire what legal rights and obligations, if any, were created by the conversation as to insurance, and, if any were thereby brought into existence, whether admiralty has jurisdiction to enforce them.

The Barge was loaded on Friday, July 21. There are in that connection some things hard to understand. It had a dead weight capacity of 350 tons, yet only 150 tons of the fertilizer were placed on it; another barge being used for a small surplus of 10 or 12 tons. As the cargo was put on its deck, the superintendent of its owner was obviously a little concerned about its steadiness, and he had 25 tons of gravel placed in its hold as ballast. This gentleman had had much water front experience, but he had been in the barge owner's employ for only about 3 weeks. Because this was the first time he had put this Barge in use, because its type was one with which he was not familiar, or for some other reason, he tells us he remained up practically all of Friday night supervising its loading, or watching how it acted after it was loaded, a closeness of observation which sharply contrasts with the lack of vigilance subsequently shown.

Between 7 and 8 on the morning of Saturday, July 22, a tug came for the Barge and towed it to the slip in which it afterwards sank, arriving there at about 5 minutes after 8. At that time another barge was lying at Pier 1, and the tug placed the one concerned in this controversy alongside the bulkhead already mentioned, and which extends easterly at right angles to Pier 1, or approximately so. It forms the northern retaining wall of the slip. The Barge was made fast to this bulkhead by the scowman who had come over on it. There is some testimony that he drew the lines too taut. This he naturally denies; but, if he is wrong, it is not perceived that any error in that respect could have contributed to the misfortune which subsequently happened. It is equally unimportant whether the tugboat captain selected the precise mooring place, as the Agencies' witnesses say he did, or went where they told him to go, as he claims was the fact. The Agencies people were there. They saw where the Barge was moored, and it is quite manifest that it never occurred to any of them that it was where it should not be.

The lease from the Canton to the Agencies said nothing about the bulkhead, and some contention is made by the lessor that the Agencies had no right to permit anything to tie up at it. There is, however, no room for doubt that barges and other light craft were frequently there, and that the practice was so habitual, and had extended over so great a length of time, that the Canton must have known of it. Probably because of the recent entrance of this Barge into harbor work, no regular scowman had as yet been engaged for it. One had been sent around from Block street on it, but, whether his employer so intended or not, he acted as if his responsibility for it ended when he had made it fast at its destination. He left it shortly after noon on Saturday, he did not then intend to come back to it, and he never did. The superintendent of the barge owner unquestionably thought that there should be some one to look after it on Sunday morning, although why it would need attention then, and not on Saturday evening and through the night of Saturday-Sunday, is not explained. He employed a watchman, and told him to go there Sunday morning.

The person so chosen has testified. After seeing and hearing him, I do not know whether he was ever there or not. He says he got there before 8 in the morning and left before noon. How long he was there he says he does not know, and it was quite manifest that he did not care. When, about 4 in the afternoon, the barge owner's superintendent arrived, he saw some one going up the hill, and he thought that perhaps the figure was that of this watchman. He may be right. If so, instead of the person in question getting there in the morning, he doubtless did not come until well on into the afternoon. At that time a glance would have shown that the Barge was in bad shape. He may have thought that the safest thing for him was to get away before he could be asked to explain what had happened while he was supposed to have been watching and was not. The watchman for the Agencies, who went on the Barge on Sunday morning and noticed that it was in distress, did not see him.

It is thus plain that the Barge was, by the neglect of those employed by its owner, left unlooked after from not later than 2 o'clock on Saturday afternoon until about 4 on the afternoon of the next day. It was during this interval of some 26 hours that the damage to the Barge was done. Only one witness other than the Barge watchman, who did not watch, claims to have seen the Barge during this period. He was the regular watchman for the Agencies. He was on the ground when the Barge came in on Saturday. He and other witnesses from the Agencies say that at that time it had a marked list. That there was any at all is denied by people who were on the tugboat and by the scowman. They were in an excellent position to observe, and most of them have no direct interest in the controversy. Nevertheless, I cannot accept their testimony in this respect. Everything which subsequently happened is so thoroughly in harmony with the statement of the Agencies witnesses as to the listing that I am persuaded that the Barge was already listing when it came into the slip. It is to be remembered that they, too, are as disinterested as anybody in an admiralty case ever seems to be. When it was tied up the list was shoreward, and all the evidence shows that it steadily increased until quite late on Sunday afternoon, when the removal of the cargo began.

By 8 o'clock or thereabouts on Sunday morning, when the Agencies watchman saw it, it had listed 2 feet more than on the day before. He went aboard of it, but could not see any water. He attempted to work the pumps, but could not. He tried by telephone to get into touch with the Agencies manager, but failed. When the superintendent for the Barge owner arrived in the neighborhood of 4 o'clock, he saw that something was seriously wrong. His story of conditions as he found them confirms the accuracy of the description given of them by the Agencies watchman, although in the intervening 8 hours the list had apparently grown still more alarming. He tried the pumps. They sucked. He attempted to call a tug, but failed. Meanwhile the Barge was obviously going still deeper. He went off for assistance, and came back with a gang of 9 men. It was then about 6:30 in the afternoon of Sunday. He could hear water running in, although he could not see it. He started the pumps. One of them, at least, should have been able to reach the water in spite of the list, or because of it, but no appreciable quantity was lifted. He began to unload as carefully as he could. By 11 o'clock or thereabouts he had gotten off some 18 or 20 tons. Then the Barge somewhat suddenly righted itself, and remained for about 20 minutes on an even keel, and then went over away from the bulkhead until her offshore side in part, at least, lay upon the bottom, where it remained until raised by a wrecking crew. The latter, after vainly attempting to reduce the volume of water in it by the use of an 8-inch centrifugal pump, sent a diver down, who discovered that in its bottom, towards the bulkhead, a hole had been pierced, obviously by two broken-off piles which were there. After this hole was stopped, chains were put around the Barge, which was then towed away and subsequently righted.

[1] So soon as the Canton heard the story, it had the piles pulled out. At that time, their tops were 6 feet 6 inches below the surface at

mean low water. They had evidently originally been deeply driven in. It was not possible readily to extract them, and they were broken off about 15 feet below the water. They were about 4 feet from the face of the bulkhead, at a point in the neighborhood of 80 feet from the line of Pier 1. Whatever may have been the original cause of the Barge's coming into contact with these piles, there is no doubt that they did go through its bottom, and that a part, at least, of the damage done was caused by them.

Does this fact make the Canton liable in whole or in part? Not much time need be expended upon its contention that it owed no duty of any kind to the Summers. It knew that on occasion boats which had business with the Agencies tied up at the bulkhead. The slip was used, not only by the Agencies, but by many large vessels, which were in the habit of docking on the other side of it. Tugs habitually maneuvered in it. It is true that none of these would ordinarily come so close to the bulkhead, at a point so near the center of the slip as these piles were; but no one could tell when something out of the common would bring some vessel over them. If the Canton had known that they were present, it would have been bound either to remove them or to give effective warning of them. If it had reason even to suspect their existence, it would doubtless have been bound to search for them.

In this case we may go farther, and assume, without deciding, that it would be answerable if they could have been found by any such inspection as a prudent owner of wharf property could reasonably make of the bottom of waters over which vessels approaching its piers are likely to pass, to come, or to be. The Canton was in the habit of dredging out this slip, but it could not carry its dredging operations within 4 feet of the bulkhead without endangering that structure itself. The soundings which were often taken of the water had not disclosed these piles. The slip had been in use for years. These piles must have been driven in and broken off a long while ago. So far as the record discloses, no living man knew of them or had any occasion to suspect their existence. The Canton had not warranted to the Summers that the slip was safe. The utmost limit of its obligation was to use all reasonable care to make and keep it so. There is nothing here to show that it failed to do so.

[2] How stands the case against the Barge? It was moored in a place which it had every reason to suppose was safe. If it came into contact with the piles because of any circumstance in which some defect in it, or in the care its owner's agents gave to its cargo, had no part, it can be held liable for only so much of the loss suffered, if any, as could have been prevented by the exercise of reasonable care on its part. A careful examination and analysis of the testimony has convinced me that the piles would have done no damage to this Barge, had it been seaworthy and in proper trim when it was made fast over them. With the load it had, it drew but 5 feet of water. The tops of the piles after the accident were 6 feet 6 inches below mean low water, and actual low water at the time in question was more than 1 foot 6 inches higher than the mean. There should then have been, at all times, a minimum of some 3 feet of water between the piles and the

bottom of the Barge. No wave which a passing steamer could have stirred up would have been likely to have brought them into contact. There was nothing unusual in the weather conditions.

After making all possible allowance for the uncertainty of nice calculation of feet and inches, the case against the piles being primarily responsible for the accident still seems convincing. The evidence points to the conclusion that some defect in the Barge was the primary cause of the loss, and leaves no room for question that a failure to give it the care which its owner believed it required made that loss far more serious than it would otherwise have been. The fact that the superintendent put only 150 tons on it, when there were but a few tons more to be carried for the same owner, although it should have been able safely to carry twice as many, and his all-night vigil, are very suggestive that he felt something was wrong. Before the Barge arrived at the end of its short journey, it had begun to list, and it kept listing more and more until the removal of part of its cargo enabled it to right itself in what proved to be a dying rally. It was not the damage from the piles which caused it to list, but it was the listing which made contact with the piles possible. The superintendent of the owner knew that it needed constant looking after. Whether he intended that the scowman whom he sent with it should stay on it until relieved on Sunday morning does not appear, but it is certain that he did attempt to have a watchman there on the morning in question. He himself expected to come there on Sunday afternoon, and did; but it was then too late.

It is unnecessary here to renew the discussion whether in Baltimore harbor due care always requires the presence of a watchman or caretaker with every loaded barge; for, whatever may or may not be the usual rule, there is no question, under the facts of this case, that the necessity of having one at frequent intervals was fully recognized by the superintendent of the Barge owner. Through the neglect of duty of those whom he employed for the purpose, the Barge was left unwatched for more than 24 hours.

When the scowman left on Saturday afternoon, he must, in spite of his denial, have known that it was listing, or he could have done so, had he given it any careful examination. As late as Sunday morning, it would probably have been possible to prevent most of the loss. It should, moreover, be said that there is something very curious as to the action or the nonaction of the pumps, in spite of the evidence in general terms that they had been gone over and were in good condition. If the listing of the Barge was caused by water coming into it, either through the hole made by the piles or otherwise, by 6:30 Sunday afternoon there must have been a good deal in it. One of the pumps, if not both, should have been able to get hold of it. Neither could. What was wrong in their condition or in their construction, I do not know; but it is certain they were useless when, normally, they should have been of much service.

It follows that the libel against the Canton Company must be dismissed, but that the Summers is entitled to a decree against the Barge for the amount of the loss, with interest thereon.